JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **DIGITAL CBT LLC,** | ) |
| **Plaintiff,** | ) **Case No.: CV 12-06421-CJC(JPRx)** |
| **v.** | ) |
| | ) |
| **AT&T SERVICES, INC.,** | ) |
| **Defendant.** | ) **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| **AT&T SERVICES, INC.,** | ) |
| **Counterclaimant,** | ) |
| **v.** | ) |
| **DIGITAL CBT LLC,** | ) |
| **Counterdefendant.** | ) |

# I.  INTRODUCTION

Plaintiff and Counter-Defendant Digital CBT LLC ("Digital CBT") brought this patent infringement action against Defendant and Counter-Claimant AT&T Services, Inc. ("AT&T").  The patent-in-suit, U.S. Patent No. 5,805,173 (the " '173 Patent") was filed in 1995 by a third party and was sold to Digital CBT in October 2011.  Following its purchase of the '173 Patent, Digital CBT filed this lawsuit against AT&T, alleging that the '173 Patent, which is entitled "System and Method for Capturing and Transferring Selected Portions of a Video Stream in a Computer System," is infringed by a number of AT&T's digital video recorders ("DVRs") used with AT&T's U-verse Internet Protocol Television service.  (Dkt. No. 1 ["Digital CBT Compl."].)  AT&T subsequently counterclaimed, seeking a declaration that it has not infringed any claim of the '173 Patent and that the '173 Patent is invalid or unenforceable.  (Dkt. No. 14 ["AT&T Countercl."].)

Before the Court are AT&T's motion for claim construction and partial summary judgment, (Dkt. No. 55), and Digital CBT's cross-motion for summary judgment, (Dkt. No. 58).  AT&T seeks summary judgment of non-infringement of all claims of the '173 Patent as to all AT&T U-verse products and services, including the accused U-verse DVRs[1] and any other equipment, such as residential gateways and set-top boxes, that operates in conjunction with the accused U-verse DVRs.  (Dkt. No. 68 [Mem. of P. & A. in Supp. of AT&T's Mot. for Claim Construction & Partial Summ. J. ("AT&T Mem.")] at 3.)  Alternatively, AT&T moves for summary judgment on the basis that independent

---

[1]  Digital CBT accuses AT&T's IPN 430, IPN 4320, VIP 1225, VIP 1216, VIP 2250, and IPN 7500 U-verse DVR models, both considered by themselves and in conjunction with AT&T Residential Gateways and other AT&T U-verse set-top boxes.  (*See* Dkt. No. 72 [Mem. of P. & A. Supporting Digital CBT's Mot. for Summ. J. of Infringement ("Digital CBT Mem.")] at 2−3; Dkt. No. 55-1 [Decl. of Michael McBride in Supp. of AT&T's Mem. of P. & A. in Supp. of Mot. for Claim Construction & Partial Summ. J. ("McBride Decl.")] Ex. 7 [Digital CBT's Third Supplemental Resps. to AT&T's First Set of Interrogs.], at 3−6.)

1    claims 1, 10, 11, and 29 of the '173 Patent are invalid as anticipated by prior art.  (*Id.*)

2    Digital CBT, on the other hand, requests that the Court grant summary judgment that

3    AT&T's U-verse DVRs and related products infringe claims 1 through 11, 14, 15, 22,

4    26, 29, 30, 32, and 34 of the '173 Patent.  (Digital CBT Mem. at 29.)

5

6    The Court finds that AT&T is entitled to summary judgment of non-infringement

7    as to all claims of the '173 Patent.  The Court's analysis in reaching this finding consists

8    of two parts.  First, as to independent claims 1 and 10, the Court finds that, properly

9    construed, AT&T's accused products do not satisfy the claims' "analog video signal"

10   and "video decoder" limitations, which the Court construes to require conversion of a

11   signal containing analog-formatted video information.  As the Court finds no genuine

12   dispute that AT&T's accused devices only receive and process signals containing

13   digitally formatted video, summary judgment in AT&T's favor is warranted as to claims

14   1 and 10.  Second, the Court finds that Digital CBT has provided no material evidence

15   that the accused devices contain the recited circuits or method for performing various

16   required functions with respect to a "selected portion of the video signal" (claim 11) or a

17   "desired portion" of frames of the video signal (claim 29).  Consequently, AT&T is

18   entitled to summary judgment as to independent claims 11 and 29.

19

20   Because the '173 Patent's remaining claims are all dependent on claims 1, 10, 11,

21   and 29, the Court GRANTS AT&T's motion for partial summary judgment of non-

22   infringement as to all claims of the '173 Patent and DENIES Digital CBT's cross-

23   motion for summary judgment of infringement.  The Court further holds that, to the

24   extent AT&T's counterclaim seeks a declaration of invalidity and unenforceability of

25   the '173 Patent, it is moot.

26

27   //

28   //

## II.  BACKGROUND

### A.  AT&T's U-verse Television Service

AT&T offers a service called U-verse that delivers video service, including television, to subscribers.  (Dkt. No. 76 [Separate Statement of Undisputed Facts Supporting Digital CBT's Mot. for Summ. J. of Infringement ("Digital CBT UF")] No. 1.)[2]  AT&T's U-verse Internet Protocol Television service allows users to watch digitally formatted video from any U-verse DVR or set-top box in their home.  (Dkt. No. 69 [AT&T's Statement of Uncontroverted Facts & Conclusions of Law in Supp. of Mot. for Claim Construction & Partial Summ. J. ("AT&T UF")] Nos. 50, 61.)  According to AT&T, the U-verse service is "an all-digital alternative to traditional analog television" as it "uses advanced computer protocols to transmit and receive digitally-formatted data."  (Dkt. No. 71 [Decl. of Dr. Ahmad Ansari, Ph.D. in Supp. of AT&T's Mem. of P. & A. in Supp. of Mot. for Claim Construction & Partial Summ. J. ("Ansari Decl.")] ¶ 8.)  Indeed, AT&T asserts that its U-verse service takes advantage of "the same Internet Protocols that are used to transmit digital website data over the Internet."  (*Id.* ¶ 9.)  The U-verse DVRs receive video data only from the U-verse distribution network and from other U-verse DVRs within a customer's home network.  (AT&T UF No. 53.)  AT&T asserts that the U-verse DVRs receive packetized data in a compressed digital format that the telecommunications industry calls "H.264."  (Ansari Decl. ¶¶ 14, 16.)

AT&T specifically designed its U-verse service to transmit digital television data to U-verse customers using a mix of fiber optics and AT&T's preexisting copper wiring infrastructure, known as "twisted pair" in the telecommunications industry.  (*Id.* ¶ 10.)  According to AT&T, a carrier signal is used to carry an information signal, such as an

---

[2]  Unless otherwise indicated, all citations to the parties' respective statements of undisputed facts are of facts that are not genuinely disputed.

analog video signal or a digital video signal, during transmission.  (Dkt. No. 70 [Decl. of Dr. Kevin Jeffay, Ph.D. in Supp. of AT&T's Mem. of P. & A. in Supp. of Mot. for Claim Construction & Partial Summ. J. ("Jeffay Decl.")] ¶ 22.)  This is done by "modulating" or attaching the information signal to the carrier signal.  (*Id.* ¶¶ 23−24.)  Once transmission is complete, AT&T asserts that the video signal is "decoupled" from its carrier wave.  (*Id.* ¶ 25.)

**B.  The Patent-in-Suit**

The '173 Patent claims a system and method for capturing and transferring selected portions of a video stream in a computer system.  The '173 Patent is directed to "selectively processing a video signal in accordance with instructions from application software."  (McBride Decl. Ex. 1 [" '173 Patent"] at Abstract.)  Claims 1, 10, 11, and 29 of the '173 Patent are the '173 Patent's only independent claims.

Claims 1 and 10 of the '173 Patent recite a "video decoder" for converting an "analog video signal" to "digital data."  (*Id.* at 22:9−10, 22:66−67.)  In relevant part, claim 1 recites:

> *1.  A system for processing an analog video signal in accordance with instructions from an application software, comprising:*
>
> > *a video decoder for converting the analog video signal to digital data . . . .*

(*Id.* at 22:6−10.)  Likewise, independent claim 10 recites in relevant part:

> *10. A multimedia system for digitally processing analog video signal, comprising:*
>
> > *a CPU;*
>
> > *a display memory for storing video and graphic data;*

> *a video decoder for converting said analog video signal to digital data . . . .*

(*Id.* at 22:62−67.)

Claims 11 and 29 do not recite an "analog video signal" or a "video decoder." (*See id.* at 23:11, 24:31.) Claims 11 and 29 do require performance of three discrete functions, however. Claim 11 requires the three functions to be performed by circuits:

> *11. A system for processing a video signal comprising a series of frames in accordance with instructions from an application software, comprising:*
>
> *. . .*
>
> *a video processing system associated with the peripheral memory for processing the video signal;*
>
> *wherein the video processing system includes:*
>
> > *a circuit for sending a selected portion of the video signal from a plurality of frames to the peripheral memory for storage;*
> >
> > *a circuit for detecting when the selected portion of the video signal for a threshold number of frames has been stored in the peripheral memory; and*
> >
> > *a circuit for allowing the selected portion of the video signal for the threshold number of frames to be transferred to the main memory for use by the application software.*

(*Id.* at 23:11−13, 23:19−32.) Claim 29 is a method claim, and recites a step that is nearly identical to the functions carried out by the circuits recited in claim 11. (*See id.* at 24:35−44.) It recites:

> *29. In a system including a processing unit, a main memory and a bus system operatively coupling the processing unit and the main memory, a method for capturing data from a video signal comprising a series of frames, the method comprising the steps of:*
>
> > *providing a peripheral memory operatively coupled to the bus system;*

> *capturing data from a desired portion of each frame of the video signal;*
>
> *storing the data in the peripheral memory;*
>
> *determining each time that a desired amount of the data is captured and stored in the peripheral memory, wherein the desired amount includes the desired portion of a plurality of the frames of the video signal; and*
>
> *transferring the desired amount of the data across the bus system to the main memory each time the desired amount of the data is captured.*

(*Id.* at 24:28−44.)  Just as claim 11 requires "a circuit for sending a selected portion of the video signal from a plurality of frames to the peripheral memory for storage," claim 29 requires the step of "capturing data from a desired portion of each frame of the video signal" and "storing the data in the peripheral memory." Similarly, just as claim 11 requires "a circuit for detecting when the selected portion of the video signal for a threshold number of frames has been stored in the peripheral memory," claim 29 requires the step of "determining each time that a desired amount of the data is captured and stored in the peripheral memory, wherein the desired amount includes the desired portion of a plurality of the frames of the video signal."  Finally, just as claim 11 requires "a circuit for allowing the selected portion of the video signal for the threshold number of frames to be transferred to the main memory for use by the application software," claim 29 requires the step of "transferring the desired amount of the data across the bus system to the main memory each time the desired amount of the data is captured."

## III.  LEGAL STANDARDS

The Court may grant summary judgment on "each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P.

56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In contrast, where the non-movant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the non-moving party's case, *Celotex*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (1) citing to materials in the record, (2) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (3) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that

would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id.*; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c).

A determination of infringement requires a two-step analysis.  First, the court determines the scope and meaning of the patent claims asserted.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*).  Second, the properly construed claims are compared to the accused device to determine whether there is infringement.  *Id*.  When performing the first step, the court is to construe the claims of the patent as a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).  Accordingly, the words of the claims are of "primary importance" in the effort to determine precisely what is claimed by the

patent.  *Id*.  In construing the claims of a patent, "words of a claim are generally given their ordinary and customary meaning."  *Id*.  (citation omitted).  In construing the patent's claims, the Court first considers whether the ordinary meaning of claim language as understood by a person of skill in the art is "readily apparent."  *Id.* at 1314.  "[C]laim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id*.

Where, however, the meaning of a claim term as understood by persons of skill in the art is not immediately apparent, the Court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)) (internal quotation marks omitted).  In such cases, claim construction begins with the intrinsic evidence associated with the patent, including the claims themselves, the specification, and the prosecution history.  *Id*. at 1317–19.  The specification is the primary basis for construing the claims.  *Id*. at 1315.  The specification is always highly relevant to the claim construction analysis, and is the single best guide to the meaning of a disputed term.  *Id*.  "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claim in 'full, clear, concise, and exact terms.' "  *Id.* at 1316 (citing 35 U.S.C. § 112).  Finally, "extrinsic evidence" such as dictionary definitions and expert reports "may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Id.* at 1319.  In light of the flaws inherent in extrinsic evidence, district courts have discretion whether to admit and use such extrinsic evidence.  *Id.*

//

//

## IV. ANALYSIS

### A. Claims 1 and 10

#### 1. Construction of "analog video signal" and "video decoder for converting the analog video signal to digital data"

Claims 1 and 10 of the '173 Patent recite a "video decoder" for converting an "analog video signal" to "digital data." ('173 Patent at 22:9−10, 22:66−67.) AT&T proposes construing the term "analog video signal" to mean "a signal containing analog-formatted video information." (AT&T Mem. at 11.) Likewise, AT&T proposes to define "a video decoder for converting the analog video signal to digital data" as "a video decoder that converts the analog-formatted video information to digital data." (*Id.*) Digital CBT's opposition brief does not provide a concise construction of these terms. Its memorandum in support of its own motion for summary judgment, however, urges the Court to adopt the definitions of "analog" and "signal" found in the dictionary. Piecing together these dictionary definitions, Digital CBT proposes construing "analog video signal" to mean "a signal that contains information constituting or relating to video . . . in which data is represented by continuously variable physical quantities." (Digital CBT Mem. at 5 (quoting Dkt. No. 77 [Decl. of Paul Groepler Supporting Digital CBT's Mot. Summ. J. of Infringement ("Groepler Decl.")] Ex. 10 (Merriam−Webster Dictionary)) (internal quotation marks omitted).) The parties' dispute might be summarized as follows: whereas AT&T contends that the focus should be on the underlying format of the video, Digital CBT contends that the focus should be on the nature of the physical signal being transmitted. (*See* Dkt. No. 96 [Decl. of Paul Groepler Opposing AT&T's Mot. for Claim Construction & Partial Summ. J. ("Groepler Opp'n Decl.")] ¶ 34 ("From the perspective of a person of ordinary skill in the art, what counts is not an abstract concept of underlying data but the actual, physical signal being

transmitted and received.").)  After considering the '173 Patent and the parties' arguments, the Court agrees with AT&T's construction.

At the outset, the Court notes that it is not "immediately apparent" whether the word "analog" in "analog video signal" modifies "signal" (in the sense of a physical signal) or is more properly viewed as modifying "video."  An "analog video signal" could just as well mean a "signal of analog video" as it could mean "an analog signal of video."  Therefore, the Court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water*, 381 F.3d at 1116) (internal quotation marks omitted).

### a.  Claims Language

The Court first considers the claims themselves.  Claims 1 and 10 recite "a video decoder for converting the analog video signal to digital data."  ('173 Patent at 22:6−10, 22:62−67.)  The claims thus use the modifier "analog" to describe the input of the video decoder and the modifier "digital" to describe the data after the video decoder performs the analog-to-digital conversion.

Importantly, the claim language indicates that the "analog video signal" serves as an input to a "*video* decoder."  This indicates that the claimed invention covers the decoding of video, not the decoding of a physical signal.  Claims 1 and 10 could have instead recited a "signal decoder," or could even have recited a generic "decoder" or "converter."  Indeed, the materials cited by Digital CBT in its opposition brief do just that, using terms such as "decoder" and "analog-to-digital converter," rather than the more specific term "video decoder."  (*See, e.g.*, Dkt. No. 94 [Mem. of P. & A. Opposing

AT&T's Mot. for Claim Construction & Partial Summ. J. ("Digital CBT Opp'n")] at 15 (citing Groepler Opp'n Decl. Ex. 40) (asserting that AT&T's VDSL technology in its U-verse system uses a "*decoder*" to extract a transmitted data frame after the incoming signal is demodulated); *id.* at 15−16 (citing Groepler Opp'n Decl. Ex. 41) (asserting that VDSL technologies use orthogonal frequency-division multiplexing ("OFDM") and that analog OFDM signals are received and "converted to digital data by an '*A/D [analog-to-digital] Converter*' " (emphasis added)).) Terms such as "decoder" and "analog-to-digital converter," as used in the materials cited by Digital CBT, could refer to the decoding of either signals or video. The '173 Patent's use of the term "video signal," however, unambiguously indicates that what is being decoded is video information. And because the output of the recited "video decoder" is "digital data," the input "analog video signal" logically refers to analog-formatted video information.[3]

By contrast, the language of the claims themselves (as well as the patent's specification) simply does not support Digital CBT's proposed construction of "analog video signal" to mean "a signal that contains information constituting or relating to video . . . in which data is represented by continuously variable physical quantities." (Digital CBT Mem. at 5.) Nowhere do the claims or the specification speak of "continuously variable physical quantities" or the physical representation of video data. Nor does Digital CBT contend otherwise. Rather, it raises just one argument based on the claims' affirmative language. It points out that "although the claims refer to 'digital data,' they do not refer to 'analog data' or 'analog information.' " (Digital CBT Opp'n at 12.) While this language does plausibly support Digital CBT's construction, it is also

---

[3] The Court finds numerous other instances in the claims themselves that support AT&T's proposed construction. Notably, numerous uses of the term "video signal" refer to the treatment of video information rather than a physical signal. Claim 11, for example, describes a video signal as "comprising a series of frames." ('173 Patent at 23:11.) Actual physical signals do not contain frames; rather, video information contains frames. Similarly, claim 25 describes "a full second of the video signal." (*Id.* at 24:7−8.) Under Digital CBT's construction of "video signal," this phrase would refer to a second of physical signal transmission; under AT&T's construction, it would refer to a second of video content. The Court finds that the latter construction was the intended meaning.

not inconsistent with AT&T's construction — if "analog video signal" means "signal containing analog-formatted video information," it would make sense that the "video decoder" would convert the analog-formatted video contained in the signal to digital data.  Given that the claims themselves are otherwise replete with language supporting AT&T's construction, Digital CBT's argument in this regard is not compelling.[4]

In sum, the Court finds that Digital CBT's construction of "analog video signal," which focuses on the physical signal itself, finds no support in the patent's claim language.  To the contrary, the claims themselves indicate that "analog" refers to the format of the video information.

### b.  Specification

"The claims, of course, do not stand alone."  *Phillips*, 415 F.3d at 1315.  Rather, they "must be read in view of the specification, of which they are a part."  *Id.* (quoting *Markman*, 52 F.3d at 978) (internal quotation marks omitted).  Importantly, "[t]he claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose."  *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).  Here, the '173 Patent's specification strongly indicates that the term "analog video signal" refers to a signal containing analog-formatted video information.

---

[4]  Notably, Digital CBT's construction of "analog video signal" in its memorandum in support of its own motion for summary judgment relies primarily on extrinsic, non-technical dictionary definitions of "signal," "analog," and "digital."  (*See* Digital CBT Mem. at 6.)  After producing a proposed construction of "analog video signal" that is derived from these various dictionary definitions, Digital CBT contends that its construction should be adopted because "[t]he '173 Patent does not require that an 'analog video signal' be in any particular analog format," but instead "encompasses analog video signals from any source, which means that the signals could be in any number of formats."  (*Id.* at 7.) This approach to claim construction, however, was rejected by the Federal Circuit sitting *en banc* in *Phillips*.  *See* 415 F.3d at 1320 (rejecting approach to claim construction whereby the specification merely "serv[es] as a check on the dictionary meaning of a claim term").

The '173 Patent is designed, in part, to provide "a system and method for real time processing of video data in a multimedia computer system." ('173 Patent at 2:7−9.) The "Background of the Invention" section of the patent distinguishes the video processing method of a computer (which has a microprocessor) from "a television or video monitor," which, according to the patent, "[t]ypically . . . use[] a cathode ray tube to draw an image on the screen." (*Id.* at 1:17−18.) According to the patent, "[s]tandard video formats, such as NTSC and PAL, include . . . active video data," including "data that determines the intensity and color of pixels displayed on a television or video monitor." (*Id.* at 1:13−17.) The Background section further notes that "[a] large variety of circuits have been designed for processing video," including "circuits . . . designed for . . . converting analog video signals into digital form for processing using a microprocessor." (*Id.* at 1:58−59, 1:61−64.) The intrinsic record thus indicates that the standard video formats of the day — and more specifically, those video formats' active video data for determining the intensity and color of video pixels —were incompatible with microprocessors found in computers. Notably, the Background section describes the conversion of "analog video signals" specifically in the context of conversion of such signals "into digital form *for processing using a microprocessor.*"

Significantly, the only video formats mentioned in the '173 Patent's written description are the NTSC, PAL, and SECAM standard analog signals used by television systems in the mid-1990s. (*See, e.g.*, *id.* at Fig. 2 (describing "video source," the source of the analog video signal, as a "NTSC/PAL/SECAM Video Source").) There is no genuine dispute that the video information in an NTSC, PAL, or SECAM signal is in an analog format. (*See* AT&T UF No. 18.)[5] Digital CBT contends that this point is

---

[5]  Digital CBT disputes this fact in part. (*See* Dkt. No. 95 [Separate Statement of Disputed Facts in Opp'n to AT&T's Mot. for Claim Construction & Partial Summ. J. ("Digital CBT DF")] No. 18.) Digital CBT appears to only dispute this fact to the extent it argues that some of these formats are potentially not analog under AT&T's expert's definition of "analog." (*See* Groepler Opp'n Decl. ¶ 23.) Digital CBT does not dispute, however, that the video information in such signals is in an analog format.

"irrelevant to infringement in this case, because none of the claims of the '173 Patent are limited to NTSC, PAL, or SECAM video signals or any other particular format or standard." (Digital CBT Opp'n at 10.) Moreover, Digital CBT argues, "[t]he '173 Patent says nothing whatsoever that could limit the patented invention to NTSC, PAL, or SECAM." (*Id.*) Digital CBT's argument misses the point. The exclusive reference to these standards in the patent's written description does not limit the claimed invention to those three standards; it does, however, provide evidence from the intrinsic record of how to construe the limitation reciting a "video decoder for converting [an] analog video signal to digital data." This is because the analog video information in the NTSC, PAL, and SECAM signals must necessarily be converted to digital data before it can be compatible with a computer's microprocessor. (*See* '173 Patent at 1:61−64 (stating that "circuits have been designed for . . . converting analog video signals into digital form *for processing using a microprocessor*").) The specification's exclusive reference to signals containing analog video information that would be incompatible with a computer's microprocessor absent a conversion of the video data is strong evidence in support of AT&T's proposed constructions of "analog video signal" and "video decoder." *See V–Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").

Digital CBT also argues that because "[t]he written description encompasses 'analog video signals' from any source," (*see* '173 Patent at 4:55−57 ("The input analog video signal may be obtained from TV tuners, VCRs, cameras, or other video sources.")), the written description thus indicates that "the signals could be in any number of formats." (Digital CBT Opp'n at 10.) But the written description merely refers to video "sources," not to video "formats." A signal containing analog-formatted video information may come from any number of sources.

AT&T's proposed construction of "analog video signal" is further supported by the conspicuous absence of any description in the '173 Patent of "carrier signals" or the process of decoupling a video signal from a carrier signal.  According to AT&T, a carrier signal is used to carry an information signal — such as an analog video signal or a digital video signal — during transmission.  (Jeffay Decl. ¶ 22.)  AT&T asserts that this is done by "modulating" or attaching the information signal to the carrier.  (*Id.*)  Digital CBT contends that the process of decoupling the video data in H.264 format from the carrier signal "constitutes converting the analog video signal to digital data."  (Digital CBT Mem. at 21−22.)  Yet the '173 Patent never describes data "modulated on a carrier signal," nor does it describe converting the analog video signal to digital data in terms of decoupling a carrier signal from a digitally formatted video signal.  Digital CBT admits as much.  (*See* Digital CBT DF Nos. 21−22 (leaving undisputed AT&T's proposed statements of fact that "[t]he '173 Patent does not describe a 'carrier signal' or data 'modulated on a carrier signal' " and that "[t]he '173 Patent does not describe converting the analog video signal to digital data in terms of removing or decoupling a 'carrier signal' from a video signal that is already in a digital format").)

The Court therefore finds that AT&T's construction of the recited "video decoder for converting [an] analog video signal to digital data" best comports with the claims themselves and the patent's written description.  The Court thus construes "analog video signal" to mean "a signal containing analog-formatted video information."[6]  Likewise, it construes "a video decoder for converting the analog video signal to digital data" to mean "a video decoder that converts the analog-formatted video information to digital data."

---

[6]  AT&T further urges the Court to give the term "video signal" as found in claims 11 and 29 an identical construction.  (*See* AT&T Mem. at 16−18.)  Because the Court finds that Digital CBT has failed to provide evidence that the accused devices satisfy a separate claim element found in claims 11 and 29, the Court need not construe the term "video signal" as found in claims 11 and 29.

## 2.  AT&T's Accused Devices Do Not Infringe Claims 1 and 10

The accused devices do not receive analog video signals, so they do not literally infringe the '173 Patent.  "Literal infringement of a claim exists when each of the claim limitations reads on, or in other words is found in, the accused device."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (citations and internal quotation marks omitted).  The Court has construed "analog video signal" and "video signal" to mean signals containing analog-formatted video information, and now holds that the accused U-verse DVRs do not literally infringe independent claims 1 and 10 of the '173 Patent because the accused devices receive only signals containing digitally formatted video information.[7]

AT&T has adduced evidence that its U-verse DVRs receive and process only digitally formatted and compressed video data.  For example, Dr. Ahman Ansari, Ph.D. — who is currently the lead engineer in charge of the design development, testing, and integration of the U-verse IPTV service's Consumer Premises Equipment — has provided a sworn declaration attesting that U-verse is an Internet Protocol television service that "multicasts" video streams to users by means of digital RTP (real-time transfer protocol) packets.  (Ansari Decl. ¶¶ 4, 17−19.)  Dr. Ansari further asserts based on his person knowledge as lead engineer over the development of U-verse DVRs that "the U-verse DVRs receive and process data in a compressed digital format that the telecommunications industry calls 'H.264.' "  (*Id.* ¶¶ 4, 14; *see also* Dkt. No. 78 [Confidential Decl. of William J. O'Brien Supporting Digital CBT's Mot. for Summ. J. of Infringement] Ex. 2 ["Sigma Chip Datasheet"] at SIGM000016−19, SIGM000024, SIGM000240−43 (stating that the processor used in the U-verse DVRs processes

---

[7]  Digital CBT has not asserted that the accused devices infringe the '173 Patent under the doctrine of equivalents.  Thus, the Court need not address the issue.  In any event, where a claim limitation is totally absent in an accused device, as is the case here, the doctrine of equivalents is inapplicable.  *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1332 (Fed. Cir. 2001).

numerous digital formats, including video data compressed according to the H.264 standard).)[8]

Digital CBT does not genuinely contest AT&T's evidence.  In fact, Digital CBT concedes in its opposition brief that "[d]igitally formatted data may be used as one component in creating the analog video signal," but argues that "any such data has no separate physical existence during transmission and reception."  (Digital CBT Opp'n at 13.)  This argument, however, assumes Digital CBT's own claim construction, which the Court has rejected.

Digital CBT fails to offer any material evidence that the accused U-verse devices receive analog-formatted video.  It offers no evidence, for example, from the Sigma Chip Datasheet showing that the Sigma chipsets on the U-verse DVRs are capable of receiving analog video data.  Rather, it offers evidence that its expert, Mr. Brad Martin, P.E., has conducted oscilloscope recordings of signals being transmitted and received over interfaces between AT&T's network and a U-verse subscriber's Residential Gateway, as well as signals recorded from interfaces between U-verse components within a subscriber's home.  (*See id.* at 2−3.)  These recordings, Digital CBT asserts, show that AT&T's U-verse systems use analog signals because the recorded signals

---

[8]   Digital CBT attempts to discredit Dr. Ansari's testimony by arguing that "he does not have sufficient information about the signals received by AT&T U-verse systems to know whether they receive analog video signals."  (Digital CBT Opp'n at 18.)  This is indicated, Digital CBT argues, by Dr. Ansari's deposition testimony, wherein he testified that digital video signals are modulated onto a carrier signal, but was unable to testify to particular characteristics of the carrier signal, such as the kind of modulation used, the frequency of the carrier signal, and whether frequency division multiplexing was used.  (*Id.*)  In particular, Digital CBT points to Dr. Ansari's testimony that "[a]ll I know is we are getting digital data, an MPEG-2 transport stream, coming to the set-top box.  And the carrier signal is a medium used to transport that.  I don't know the details."  (Groepler Opp'n Decl. Ex. 42 ["Ansari Depo. Tr."] at 163:18−164:7.)  Given that, under the claim construction adopted by the Court, the physical characteristics of carrier signals is irrelevant to the infringement analysis, Digital CBT's contention that Dr. Ansari's testimony should be ignored is unpersuasive.  Digital CBT does not contest that Dr. Ansari is a lead engineer at AT&T with direct involvement with and supervisory responsibilities over the design and development of AT&T's U-verse technologies.  Thus, Dr. Ansari undoubtedly has sufficient knowledge to testify as to the format of video data transmitted and received by AT&T's U-verse devices.

appear on an oscillograph as continuous analog waves. (*Id.* at 4.) But that evidence merely shows that video streams are communicated by a carrier signal that appears to be in analog form. Such evidence would possibly be material under Digital CBT's construction of claims 1 and 10, but it is not material under the construction of "analog video signal" that the Court has adopted. Notably, the very expert that conducted the oscilloscope testing on Digital CBT's behalf has conceded that he has no basis to dispute that the U-verse video information is digital. (*See* Dkt. No. 101 ["Martin Depo. Tr."] at 171:16−172:4, 188:20−189:24 (agreeing that he does not have any basis to dispute that video information communicated in a U-verse system is in the form of Internet Protocol data packets and is compressed according to digital compression algorithms such as H.264).)

In sum, Digital CBT fails to offer material evidence that the U-verse DVRs process signals containing analog-formatted video information and does not genuinely dispute evidence proffered by AT&T that the U-verse DVRs only receive packetized data in a compressed digital format. Consequently, AT&T is entitled to summary judgment that its products do not infringe claims 1 and 10 of the '173 Patent.

## B. Claims 11 and 29

### 1. Digital CBT Has Failed to Offer Necessary Material Evidence of Infringement of Claims 11 and 29

AT&T has shown that there is an absence of evidence to support Digital CBT's case with respect to claims 11 and 29. *See Celotex*, 477 U.S. at 325. Claim 11 requires circuits that perform three specific functions:

*a circuit for sending a selected portion of the video signal from a plurality of frames to the peripheral memory for storage;*

*a circuit for detecting when the selected portion of the video signal for a threshold number of frames has been stored in the peripheral memory; and*

*a circuit for allowing the selected portion of the video signal for the threshold number of frames to be transferred to the main memory for use by the application software.*

('173 Patent at 23:23−32.)  AT&T has pointed to an absence of evidence that its U-verse DVRs perform any of these required functions.  For example, as to the required "circuit for sending a selected portion of the video signal from a plurality of frames to the peripheral memory for storage," Digital CBT's evidence in support of its own motion for summary judgment consists of its expert's conclusory statement that "[e]ach DVR includes circuitry for sending a selected portion of the video signal from a plurality of frames to the peripheral memory for storage," followed by a list of documentary evidence.  (*See* Groepler Decl. ¶ 97(g).)  The documentary evidence listed by Dr. Groepler, however, amounts to nothing more than diagrams of generic hardware for "circuits" and vague descriptions of hardware functionality.  (*See id.*)  Such diagrams and descriptions may "support[] the presence of the circuitry of the systems," (Groepler Opp'n Decl. ¶ 83), but they do not provide any evidence of the *functionality* of the circuits.  Notably absent from the list of evidence is any reference to software code that would reveal functionality.  Moreover, the hardware descriptions cited by Dr. Groepler do not come close to describing the circuits' underlying functionality with the necessary detail.  These written descriptions state that U-verse hardware utilizes "[m]ultiple audio, video, and data buffers," (Sigma Chip Datasheet at SIGM000225), and that an "[Integrated Drive Electronics] controller interfaces between up to 2 external devices and the [Double Data Rate] memory," (*id.* at SIGM000225).[9]  Mapping the U-verse devices' hardware and identifying that such hardware uses buffers, however, falls far short of establishing the devices' software functionality.

---

[9]  Dr. Groepler also cross-references a number of other descriptions, including "descriptions above of the processing unit, the peripheral memory, and the bus system operatively coupling the main memory and the peripheral memory." (Groepler Decl. ¶ 97(g).)  He also cross-references his description of control structures in connection with Claim 1.  (*See id.*)  Like the other documentary evidence listed, however, such descriptions are either conclusory or fail to show that the identified circuits actually perform the required functions as described in the patent.  At most such evidence shows that such functionality is *possible* given the layout of the hardware.

Digital CBT attempts to establish that the circuits perform the required function by stating that each U-verse DVR includes circuitry for using buffering for video data and that "[s]uch buffering provides temporary data storage that *inherently* entails the detection and use of thresholds." (*See* Groepler Decl. ¶ 97(g) (emphasis added).) Similarly, with respect to the requirement of "a circuit for allowing the selected portion of the video signal for the threshold number of frames to be transferred to the main memory for use by the application software," Digital CBT's expert asserts that

> *[b]ased on the functionality of the DVR*, it is *evident* that the [System on a Chip] monitors the amount of video signal stored in the hard drive, and, when the video frames exceed a storage threshold for the hard drive or when otherwise instructed to by the application, transfers a portion of the stored video signal to RAM for use by the application software.

(*Id.* ¶ 97(i) (emphasis added).)  Essentially, Digital CBT urges the Court to assume that the U-verse DVRs must have circuits that (1) monitor the amount of video signal stored in the hard drive, (2) determine when the video frames exceed a storage threshold for the hard drive, and (3) transfer a portion of the stored video signal to RAM once the storage threshold is exceeded merely because the DVRs function in a certain way.  Such speculation on the part of Digital CBT's expert is insufficient to meet Digital CBT's burden in opposing summary judgment.  *See Thornhill Publ'g*, 594 F.2d at 738 (holding that a non-moving party's "attempt to avoid summary judgment [by] submit[ting] conclusory and speculative affidavits that fail to set forth specific facts in support of [its] theory" is insufficient to "me[et] the burden imposed by Rule 56(e)").

Digital CBT's evidence with respect to certain steps of claim 29 suffers from the same defects.  Claim 29 is a method claim, and therefore Digital CBT must present evidence showing that each step of the claimed method was actually performed.  *See Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360−61 (Fed. Cir. 2012).  As noted above, claim 29 requires steps for performing nearly the same functions that the circuits of claim 11 are required to perform:

*capturing data from a desired portion of each frame of the video signal; storing the data in the peripheral memory;*

*determining each time that a desired amount of the data is captured and stored in the peripheral memory, wherein the desired amount includes the desired portion of a plurality of the frames of the video signal; and*

*transferring the desired amount of the data across the bus system to the main memory each time the desired amount of the data is captured.*

('173 Patent at 24:35−44.)

Digital CBT's evidence with respect to claim 29's step of "determining each time that a desired amount of the data is captured and stored in the peripheral memory, wherein the desired amount includes the desired portion of a plurality of frames of the video signal" consists only of "block diagrams" and descriptions of hardware interfaces. (*See* Groepler Decl. ¶ 112(e) (citing Sigma Chip Datasheet at SIGM000173 ("Block Diagram of Host Interface," including "Peripheral Bus Interface" and "IDE/ATAPI-6 Interface"); *id.* at SIGM000225 ("The IDE controller interfaces between up to 2 external IDE devices and the DDR memory.  It provides a simple, standard interface to mass storage peripherals."); Dkt. No. 58-2 [Non-Confidential Decl. of William J. O'Brien Supporting Digital CBT's Mot. for Summ. J. of Infringement] Ex. 7 (block diagram)).) Hardware diagrams simply cannot establish the existence of software functionality for "determining each time that a desired amount of data is captured and stored in the peripheral memory."

Because AT&T has identified an absence of evidence with respect to elements of claims 11 and 29, the burden shifts to Digital CBT to identify a genuine issue of material fact by citing to specific materials in the record.  Digital CBT fails to do so, however, as it merely points to evidence offered in support of its motion for summary judgment.  (*See* Digital CBT Opp'n at 23 ("In its own summary judgment motion, Digital CBT explained why AT&T's U-verse systems fulfill these limitations of Claims

11 and 29."); *see also* Groepler Opp'n Decl. ¶¶ 82−90.)  The remainder of Digital CBT's argument in opposition focuses entirely on challenging AT&T's claim construction proposals.  (*See* Digital CBT Opp'n at 23−26.)  But the Court's finding does not depend on either party's claim construction proposals.  Rather, claim construction is not necessary because Digital CBT has simply failed to meet its burden to provide "evidence on which the jury could reasonably find for" it, *Anderson*, 477 U.S. at 252, regardless of how the claim terms are construed.  Therefore, AT&T is entitled to summary judgment of non-infringement of independent claims 11 and 29.[10]

## V.  CONCLUSION

For all the reasons set forth above, the Court finds that AT&T's products and services, including the accused U-verse DVRs and other equipment used in conjunction the accused U-verse DVRs, do not infringe any claim of the '173 Patent.  Accordingly, the Court GRANTS AT&T's motion for partial summary judgment of non-infringement as to all claims of the '173 Patent and DENIES Digital CBT's cross-motion for summary judgment of infringement.  The Court further holds that, to the extent AT&T's counterclaim seeks a declaration of invalidity and unenforceability of the '173 Patent, it is moot.


DATED:      December 3, 2013


_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[10]  Because the Court finds that AT&T is entitled to summary judgment of non-infringement of claims 1, 10, 11, and 29, it need not address AT&T's argument in the alternative that those claims are invalid as anticipated by prior art.  Nor does the Court express any opinion on AT&T's remaining non-infringement arguments.